IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Terry Hafer,
    Plaintiff,

v.

Michael J. Astrue,[1]
Commissioner of Social Security,
    Defendant.

NO. CV06-256-TUC-RCC (JM)

REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Terry Hafer seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her benefits. This Social Security Appeal has been referred to the United States Magistrate Judge pursuant to Local Rule – Civil 72.2(a)(10) of the Rules of Practice of this Court. Based on the pleadings of the parties and the record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, grant in part Plaintiff's Motion for Summary Judgment [Doc. No. 12] and deny Defendant's Cross-Motion for Summary Judgment [Doc. No. 13].

**I. Procedural Background**

Hafer applied for Disability Insurance Benefits on August 7, 2003, claiming disability with an onset date of February 19, 2002, due to diabetes, hypertension and hearing loss. (Tr.

---

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration. 42 U.S.C. § 405(g); Fed.R.Civ.P. 25(d)(1).

1

21 & 98-101). The application was denied initially and upon reconsideration. (Tr. 33-36 & 39-42). Hafer then requested a hearing before an ALJ. (Tr. 43-45). The ALJ conducted two hearings, the first on November 1, 2004, and the second on April 8, 2005. (Tr. 330-395). The ALJ denied Hafer's application in a decision dated May 22, 2005. (Tr. 18-29). Hafer requested review of the hearing decision by the Appeals Council. (Tr. 16-17). The decision became the final decision of the Commissioner when the Appeals Council did not grant Hafer's request for review. (Tr. 8-10). On May 23, 2006, Hafer commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the ALJ's decision.

## II.   Record on Appeal

### A.   Hafer's Testimony

Hafer was born on November 10, 1954. (Tr. 359). He is 6'2" tall and weighs 240 pounds. (*Id.*). He has had a hearing problem all of his life. (Tr. 363). He is divorced and has three children, age 16, 13, and 7. (Tr. 359-60). Two of the children live with him full-time and the 13 year-old lives with him part-time. (Tr. 360). He graduated high school, where he took hearing-impaired classes. (Tr. 362-63). He then completed a nursing assistant program, but did not get his diploma because the school closed. (Tr. 363).

Hafer was diagnosed with diabetes in January 2002 (Tr. 363), and he stopped working in March 2002. (Tr. 361). Prior to that time, from 1997 until 2002, he worked for Cox Communication in their warehouse doing "a lot of heavy lifting . . . ." (*Id.*). His evaluations were affected by his inability to hear people coming into the warehouse and stealing. (Tr. 364). He eventually had to be replaced by Cox because he was absent for medical reasons, was out of medical leave, and his doctor would not release him back to work. (Tr. 364). His medical problem at that time was related to abdominal pain, which was initially believed to be related to his gallbladder. (Tr. 364-65). His diabetes was also uncontrolled at the time. (Tr. 365).

Hafer, before working at Cox, also worked in a painting and remodeling business and as a cable auditor. (Tr. 361). Prior to those jobs he worked as a nursing assistant at the Rehabilitation Institute of Tucson. (Tr. 362).

Hafer stopped driving in February 2005 because of his uncontrolled blood sugar. (Tr. 360). He is unable to sit or stand for more than 15 minutes. (Tr. 365). He has pain and numbness in his legs and hands and it feels as if his circulation has been cutoff. (Tr. 365-66). Sometimes he sits in the bathtub and that helps his symptoms. (Tr. 366). He often needs help to get out of the tub and cannot fix his own meals. (*Id.*).

Hafer monitors his blood sugar levels three to six times per day. (Tr. 366). When his blood sugar is too high, he will get severe headaches, at times feels like he is "burning up," and he is unable to concentrate. (*Id.*). When his blood sugar is low, he gets cold sweats, shakes, starts feeling like he is going to pass out, and turns "really, really white." (Tr. 366-67). When his blood sugar is high he will get up and walk, but when it is necessary, he cannot walk for long periods of time because he is physically unable to do so. (Tr. 367). When it is low, he will have something like orange juice to bring his sugars up, and he will start feeling better about one and a half hours later. (*Id.*).

**B.     Medical Expert Testimony**

Alexander B. White, M.D., who is board certified in internal medicine, testified telephonically as a medical expert. (Tr. 334-35). Dr. White indicated that he had reviewed Hafer's medical records. (Tr. 335). He noted that Hafer had repeatedly complained of pain in the abdomen, but that studies did not reveal a cause. (Tr. 335). Dr. White did believe that Hafer had gastro esophageal reflux disease ("GERD") and, as of June 2002, had ulcerated lesions in his esophagus. (Tr. 336). Upon examination by Hafer's counsel, Dr. White agreed that the pain in Hafer's stomach was caused by his pain medication, ibuprofen, or by his GERD. (Tr. 356-58).

3

Dr. White noted that the latest report showed that Hafer's hearing was "okay with hearing aids." (*Id.*)   He also agreed that Hafer was diabetic, was "dyslipidemic," and therefore susceptible to cardiovascular disease. (Tr. 335-36). However, he did not find anything that, at the present time, "would in any way limit him or disable him." (Tr. 336).

Dr. White concluded that Hafer's diabetes was completely uncontrolled and notes that one of the doctors reported that, at one time, Hafer had not seen a doctor for more than one year. (Tr. 336 & 338). He indicated that Hafer would experience tiredness and blurry vision, but stated that those symptoms could be controlled if he were followed properly by a physician. (Tr. 338).

When asked by the ALJ whether, based on the medical records, it was fair to say that Hafer cannot work a full-time sedentary job, Dr. White stated that he could not see why Hafer would not be able to do such work (Tr. 341), and concluded that Hafer was not subject to any restrictions with respect to his ability to perform work. (Tr. 337).

### C. Vocational Expert Testimony

Upon questioning by the ALJ, Vocational Expert Staci Shonbrun (the "VE") was able to characterize the nature of Hafer's past work as a warehouse worker and as a cable auditor as semi-skilled and heavy, and his work as a nursing assistant as semi-skilled and medium. (Tr. 380-81). When asked whether Hafer's ability to perform these jobs would be affected by a hearing impairment, the VE thought that the job as a cable auditor might be affected. (Tr. 381). The ALJ then presented the VE with a hypothetical worker with a hearing impairment, the ability to read lips, but not able to work in a noisy environment. (Tr. 381). Given these limitations, the VE stated that she was "somewhat suspicious about the warehouse tech position, but since he did it, yes." (Tr. 382). However, the ALJ eliminated that position because Hafer was unable to do the job due to the theft that had occurred in the warehouse. (*Id.*) The VE then concluded that, if his lifting was restricted, Hafer could not perform his past relevant work as a construction laborer, nursing assistant or cable auditor.

(Tr. 382-83). Nevertheless, the VE found that he would be capable of working in housekeeping jobs, a team assembler, or in retail sales. (Tr. 383).

Hafer's counsel then asked if Hafer would be able to maintain employment even if he were required to stop and control his blood sugar for 10 to 60 minutes in a workday, and the VE indicated that he would not. (Tr. 385). The VE also stated that even minimal background noise would prevent Hafer from working in retail sales or in an assembly environment, but that he could perform the job requirements of a housekeeper. (Tr. 386). Hafer's counsel then asked the VE to consider the opinion of Nurse Practitioner Sue Medlen that indicated that, given his blood sugars, Hafer would be "unable to maintain persistence to task, maintain attention and concentration, inability to use judgment and make decisions. He's easily distracted. Poor focus." (Tr. 387). Considering those limitations, the VE indicated that Hafer would be unable to work as a housekeeper. (*Id.*) The VE also indicated that Hafer would be unable to work if his absenteeism exceeded two days per month. (*Id.*)

### D.      Medical Records

#### 1.      Hearing

On May 16, 2001, Hafer was seen by Audiologist Pamela Wood for a follow-up appointment with his then new digital hearing aids that were originally fitted on April 24, 2001. (Tr. 183). The audiologist reported that Hafer was "quite surprised by how much more he was able to hear," and reported he was hearing "extremely well, particularly at work." (*Id.*). He was told to return if he had any problems. (*Id.*).

Hafer was next seen by Audiologist Wood on February 22, 2005. (Tr. 310). At that time, Wood reported that "[a]udiometric test results revealed a significant decrease in hearing sensitivity in both ears since 2001." (*Id.*). She characterized his hearing loss as "severe to profound" in both ears. Hafer's hearing aids were cleaned and reprogrammed to better match his hearing sensitivity. Wood noted that she informed Hafer that his decrease in hearing sensitivity would result in greater difficulty understanding speech, "especially in the presence

of background noise or if trying to listen to someone who is soft spoken or speaks too fast." (*Id.*).

### 2.  Abdominal Pain

On February 28, 2002, Hafer was seen at UMC complaining of intermittent severe pain in the abdominal area. (Tr. 136-37). He was discharged home with instructions to follow-up with his primary care doctor and was given Percocet for pain. (Tr. 137).

On March 4, 2002, an abdominal ultrasound examination was performed and the impression lists "findings consistent with fatty infiltration of the liver," "hyperechoic pancreas may be related to fatty infiltration, but is non-specific," and "mile splenomegaly." (Tr. 227).   On March 7, 2002, Hafer was admitted to St. Joseph's Hospital with a chief complaint of abdominal pain. (Tr. 224). For two weeks he had pain in the right upper quadrant of the abdominal area, with nausea and vomiting. (*Id.*). An abdominal ultrasound was performed with normal results. (Tr. 226). He was discharged to home with an assessment of "acute abdominal pain, probable gallbladder disease." (Tr. 225). A HIDA scan was scheduled and he was directed to follow-up with his doctor. (*Id.*). The HIDA study was performed on March 8, 2002 and was reported as normal. (Tr. 222).

In a letter dated April 17, 2002, Marco Sprintis, M.D., notes Hafer's history of severe abdominal pain in the right upper quadrant since February and characterizes the condition as "classical biliary colic." (Tr. 204). He notes no objective findings, but finds the liver "slightly enlarged" and indicates that he will schedule Hafer "for a HIDA scan with fractionation, and an esophagogastrouodenocscopy, possibly RCP depending upon the results of the blood tests." (*Id.*).

A second HIDA scan was performed on May 3, 2002, this time with a gallbladder ejection fraction study. (Tr. 221). However, the impression reflects "less than adequate gallbladder concentration of isotope," and "no ejection fraction study could be performed as discussed." (*Id.*).

On June 4, 2002, Dr. Sprinitis reported that the "HIDA scan was negative," and that it was repeated and there was a "question of overly positive." (Tr. 218). An EGD, which involved the use of a panendoscope to inspect the esophagus, stomach and duodenum, was undertaken for further evaluation. The impression from the study was "severe ulcerated reflux esophagitis" and "severe gastritis." (Tr. 218). Dr. Sprintis' recommendation was to put Hafer on proton pump inhibitors and further work-up if necessary. (*Id.*).

On August 27, 2002, Hafer presented at UMC complaining of rectal bleeding. (Tr. 205). He was discharged with a diagnosis of "probably hemorrhoidal bleed," and was directed to follow-up with his primary care doctor or gastroenterologist. (Tr. 206).

### 3. **Sinus Condition**

On August 7, 2001, Hafer was seen at University Medical Center with recurrent sinusitis and was prescribed antibiotics and pain medication. (Tr. 185). He was seen again on December 11, 2001, with similar symptoms. (Tr. 192).

On June 9, 2003, Hafer presented at UMC complaining of face pain and sinus drainage. (Tr. 210). He was diagnosed with acute sinusitis and was discharged with Percocet and Flonase. (Tr. 211).

On June 23, 2003, Hafer was again seen at UMC in relation to his sinusitis. (Tr. 215). The clinical impression was "acute right maxillary and frontal sinusitis," and he was discharged with directions to see his regular doctor and with prescriptions for Bactrim-DS, Percocet, and Motrin. (Tr. 216).

### 4. **Diabetes**

On March 1, 2002, blood work results indicated elevated glucose levels and other abnormal findings. (Tr. 200).

On January 7, 2003, David Kahan, D.O., completed a Disability Attending Physician's Statement from Aetna Healthcare on behalf of Hafer. (Tr. 233-34). Dr. Kahan reports a diagnosis of uncontrolled diabetes with symptoms of fatigue, weakness and nausea. (Tr.

7

233). He reports treatment beginning March 1, 2002 through January 6, 2003, with nine total visits. (*Id.*). He reports Hafer's medications and indicates that his condition has retrogressed. He indicates that Hafer is presently unable to work, but then describes his physical impairment as "moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." (Tr. 234). Hafer's prognosis is characterized as "fair." (*Id.*).

On January 20, 2003, the Carondelet Diabetes Care Centers sent a lab results request to David Kahan, M.D., indicating that Hafer was schedule to be seen January 28, 2003. (Tr. 217).

A February 11, 2003, record lists an assessment of diabetes, hypertension, hyperlipidemia, and sinusitis. (Tr. 232). The plan at that time was to start diabetic classes, then insulin, and to continue on his other medications. (*Id.*).

### 5. Disability Opinions

In an undated letter, Dr. Lund indicates that Hafer has been his patient since December 7, 2004. (Tr. 321). He reports diagnoses of diabetes mellitus, congenital hearing loss, hypertension, history of severe esophagitis and bilateral knee surgeries. He reports that Hafer has "profound hearing loss" and "difficulty hearing in situations where there is background noise and with certain voices." (*Id.*). The letter concludes with the opinion that Hafer "is unable to sustain full-time sedentary work" due to his impairments. (*Id.*).

In a Disability Attending Physician's Statement prepared for Aetna Healthcare, and dated January 7, 2003, David Kahan, D.O., diagnosed Hafer with uncontrolled diabetes which resulted in fatigue, weakness, and nausea. (Tr. 233). Dr. Kahan also reported that he had seen Hafer nine times in the preceding ten months and that Hafer had been prescribed Glucophage, Actos, Urivase, Lipitor and Aciphex. (*Id.*). Although he had not been hospitalized and was ambulatory, Dr. Kahan found that his condition had "retrogressed." (*Id.*). The doctor graded Hafer as having a "moderate limitation of functional capacity," and

"capable of clerical/administrative (sedentary) activity." (Tr. 234). He reported Hafer's prognosis as "fair," but was uncertain when he could return to work. (*Id.*).

In an Attending Physician Behavioral Health Statement prepared to Aetna, and dated February 19, 2004, Nurse Practitioner Sue Medlen indicated that Hafer had been seen the day before. She reported diagnoses including diabetes, hyperlypidemia, hypertension and GERD. (Tr. 299). Nurse Medlen indicated that Hafer was easily distracted, had poor focus, and falls asleep easily, and opined that he was completely unable to work. (Tr. 300).

### III. ALJ's Decision

In the decision dated May 22, 2005, the ALJ found that the record established that Hafer's diabetes and hearing loss are considered 'severe' based on the requirement in the Regulations 20 C.F.R. § 404.1520(c)." However, she found that these medically determinable impairments "do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr. 28). The ALJ next found that Hafer was not totally credible "for the reasons set forth in the body of the decision." (Tr. 28).

The ALJ then concluded that Hafer had the ability "to perform at all exertional levels," but was "restricted from concentrated exposure to noisy work environments due to moderate sensorineural hearing loss." (Tr. 28). His residual functional capacity included the "capacity to perform light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds. He can sit, stand, and walk about 6 hours, each at a time in an 8-hour workday." (Tr. 28).

Based on the testimony of the VE, the ALJ concluded that Hafer "was capable of make [sic] a successful adjustment to work that exists in significant number in the national economy." (Tr. 29). The jobs included housekeeper, team assembler, and retail sales person. (Tr. 29).

///

///

The ALJ then concluded that Hafer could perform the demands of a full range of light work. (Tr. 29). Thus, Hafer was not under a disability as defined in the Social Security Act. (Tr. 29).

## IV. Legal Standards

### A. Standard of Review

A district court's review of a disability determination is limited, and a final administrative decision can be revised "only if it is based on legal error or if the fact findings are not supported by substantial evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1229 (9th Cir. 1987). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morgan v. Commissioner of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). It consists of "more than a mere scintilla but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Young v. Sullivan*, 911 F.2d 181, 183 (9th Cir. 1990).

"In determining whether the Commissioner's findings are supported by substantial evidence, [the Magistrate Judge] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Aukland v. Massanari*, 257 F.2d 1033, 1035 (9th Cir. 2001). However, the ALJ's decision must be upheld if the evidence is reasonably susceptible to more than one rational interpretation, *Allen v. Secretary of Health and Human Services*, 726 F.2d 1470, 1473 (9th Cir. 1984), and the court cannot substitute its judgment for that of the Commissioner. *Reddick*, 157 F.3d at 720-21.

### B. Standard for Determining Disability

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. §

10

423(d)(1)(A); 20 C.F.R. § 404.1505(a). "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996); *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed by the ALJ in a disability case. *See* 20 C.F.R. § 404.1520. At step one of the process, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity; if so, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(b). When the claimant is not currently engaged in substantial gainful activity, the ALJ, in step two, must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities; if not, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(c). A severe impairment or combination of impairments exists when there is more than a minimal effect on an individual's ability to do basic work activities. 20 C.F.R. § 404.1521(a); *Smolen*, 80 F.3d at 1290. Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing, hearing and speaking, understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

At the third step, the ALJ must compare the claimant's impairment to those in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1; if the impairment meets or equals an impairment in the Listing, disability is conclusively presumed and benefits awarded. 20 C.F.R. § 404.1520(d). When the claimant's impairment does not meet or equal an impairment in the Listing, in the fourth step, the ALJ must determine whether the claimant has sufficient "residual functional capacity" despite the impairment or various limitations to perform his past work; if so, a finding of non-disability is made and the claim is denied. 20

11

C.F.R. § 404.1520(e). When the claimant shows an inability to perform past relevant work, a prima facie case of disability is established and, in step five, "the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." 20 C.F.R. § 404.1520(f).

In this case, the determination of non-disability was divided chronologically and the ALJ made decisions at both step four and step five of the inquiry process. Specifically, the ALJ concluded that Hafer's "medically determinable impairments did not prevent [him] from performing his past relevant work as a nurse's aide and laborer from February 19, 2002 to February 1, 2004." (Tr. 28). The ALJ then concluded that, "[f]rom February 2, 2004 to the present, [Hafer] retains the residual functional capacity to perform light work..," and, other than a moderate hearing loss, "has no other limitations." (Tr. 28).

V.  **Discussion**

  A.  **Did the ALJ improperly disregard the opinions of Hafer's treating physicians?**

Hafer's first two arguments assert that the ALJ improperly disregarded the opinion of his treating medical providers and improperly relied on the testimony of Dr. White, who did not treat or examine Hafer. In evaluating the opinions of treating physicians, the opinions should be given great deference, but they are "not necessarily conclusive as to either the [claimant's] physical condition or the ultimate issue of disability." *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). While not bound by the opinions of the claimant's treating physicians on the ultimate issue of disability, the ALJ cannot reject the uncontroverted opinion of a claimant's treating physician on the ultimate issue of disability "'without presenting clear and convincing reasons for doing so.'" *Reddick*, 157 F.3d at 725 (quoting *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993)). However, when the opinion of another doctor contradicts the treating physician's opinion, "the Secretary can disregard the latter only by setting forth specific, legitimate reasons for doing so that are

based on substantial evidence in the record." *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)) (internal quotations omitted). In making this determination, it is the Court's duty to "review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick*, 157 F.3d at 720; *see also Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). Here, the Magistrate Judge finds that under either standard of review, the ALJ's determination cannot be upheld.

Hafer's specific disagreement with the decision begins with the ALJ's reliance on the opinions of "physicians" retained by the State Disability Determination Service. *Motion*, p. 8. As Hafer points out, he was evaluated by only one DDS doctor, Paul Tangeman, a psychologist. (Tr. 285 (*Psychiatric Review Technique*, dated January 16, 2004)). In her decision, the ALJ found that Dr. Tangeman's opinion "supported a finding of 'not disabled,'" but did so on the basis that other opinions in the record supported similar conclusions. (Tr. 25). However, the ALJ did not identify the other consistent opinions and, reviewing the record as a whole, the Court has found none. More important, though, is the irrelevance of Dr. Tangeman's opinion to the decision. The ALJ included no discussion of a psychiatric basis for disability and it is unclear how Dr. Tangeman's opinion could be cited in support of a determination of non-disability based on physical, rather than psychological, impairment.

Moreover, the Court has searched in vain for the records of another evaluation by a physician retained by the DDS. In the Decision, the ALJ cites to Exhibits 5B and 13F in support of her statement that other physicians have found Hafer "not disabled." Exhibit 13F is the Psychiatric Review Technique completed by Dr. Tangeman. Exhibit 5B, however, is the Secretary's decision to deny Hafer's request for reconsideration of the ALJ's decision. Obviously, the evidence cited by the ALJ does not support her conclusion.

Next, Hafer complains that Dr. White's opinions were "equivocal, confused, lacked foundation and even flat out wrong at times." *Motion*, p. 9. However, a fair reading of the

doctor's testimony does not support a wholesale finding that his testimony was unreliable. Dr. White clearly identified Hafer's impairments and even noted that the records suggested that he might be suffering from hemochromotosis and that he should follow-up with his physician. (Tr. 336). Hafer also objects to the doctor's initial conclusion that his abdominal pain was unsubstantiated. However, as Hafer indicates, this conclusion was withdrawn on cross-examination, where Dr. White, after being directed to specific entries in the medical record, agreed that Hafer's abdominal pain was the result of gastritis or caused by his medication. (Tr. 357-358). The Court finds nothing unreasonable in this change of course. To the contrary, exploring opinions and curing potential oversights is the role of cross-examination.

      Hafer next takes exception to Dr. White's opinion that Hafer had been non-compliant in the treatment of his diabetes. Hafer explains that he had "no job, no money, no insurance and three kids," and that he was not non-compliant. *Motion*, pp. 9-10. However, despite Dr. White's inability at the hearing to locate the record reflecting non-compliance, he was justified in his conclusion. In the medical records, Dr. Lund reports Hafer is being treated for diabetes and that as of December 7, 2004, he "has not been seen by any physician for over a year." This entry constitutes substantial evidence supporting Dr. White's opinion that Hafer had been non-compliant in his treatment.

      This same evidence is adequately substantial to support the ALJ's rejection of the treating medical providers' opinions that Hafer's diabetes was disabling. (Tr. 233 (Dr. Kahan); 299 (Nurse Medlen) & 321(Dr. Lund)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Secy of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Although not a certainty based on the medical records, it was not unreasonable for Dr. White to conclude that either Hafer was not compliant during the time-periods covered by Dr. Kahan's opinion (dated January 7, 2003 ), Nurse Medlen's opinion (dated

14

February 19, 2004), and Dr. Lund's opinion (undated), and/or that the subsequent year-long period of non-treatment was the primary obstacle in controlling the condition. Under the applicable standard of review, the Court cannot reject the ALJ's decision to discount the statements of the treating physicians based on Dr. White's opinion that Hafer was non-compliant.

However, because the ALJ believed that two other doctors from the State Disability Determination Service concluded that Hafer was not disabled, the ultimate decision by the ALJ may have been based, at least partially, on incorrect beliefs. The record reflects that the ALJ gave the DDS opinions "some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions . . . ." (Tr. 25). The ALJ's mistaken reliance, albeit partial, on the non-existent DDS opinions, renders suspect the final determination of non-disability. Thus, even though the ALJ's conclusion could have been supported by the record, the Court cannot affirm because the conclusion was at least partially based on erroneous information.

      **B.**    **Did the ALJ err by finding that Hafer's hearing loss was not a severe impairment?**

Hafer next object to the ALJ's determination that his hearing loss was not a severe impairment. *Motion*, p. 14. In her decision, the ALJ refers to Hafer's February 2005 audiology report and states that, "[o]toscopy revealed clear canals, but decreased hearing sensitivity in both ears," and that Hafer's "hearing aids were cleaned and reprogrammed to better match his hearing sensitivity at that time." (Tr. 24). The ALJ later concludes that Hafer suffers from "moderate sensorineural hearing loss" from February 19, 2002 to February 1, 2004, and also from February 2, 2004 to the present. (Tr. 25). These conclusions are not supported by the record.

In the February 2005 report, the audiologist states that Hafer had previously been examined in February of 2001 and found to have "a moderate to profound, sensorineural hearing loss in both ears, poorer in the left ear." (Tr. 310). This report is the only evidence

15

cited by the ALJ in support of her conclusion and it clearly reflects that Hafer's hearing loss was "moderate to profound" and not merely "moderate." Additionally, there is no basis at all for a finding that Hafer's hearing loss was rated as moderate from February 2, 2004 forward. The audiologist found that the hearing loss had increased and described it as "severe to profound." (Tr. 310). There is nothing in the record that contradicts this finding.

The ALJ's finding is significant because the VE based her opinions on a finding that his hearing loss was moderate. (*See* Tr. 382 & 383). Specifically, the VE stated, "I would suspect that Mr. Hafer has a moderate sensory neural impairment. People who usually have that they generally are advised not to work in noisy environments to protect the remaining hearing that they have." (Tr. 382). There being no basis in the record for a finding that his hearing loss was only moderate, the VE's assessment of Hafer's RFC was based on inaccurate information.

**C.     Did the ALJ improperly conclude that Hafer was not credible?**

Hafer's next assertion is that the ALJ erroneously determined that she was "not entirely credible." (Tr. 23). To support such a finding, the ALJ must provide clear and convincing reasons for rejecting the claimant's excess pain or symptom testimony, such as conflicts between the claimant's testimony and conduct, or internal contradictions in the claimant's testimony. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir 1993); *Light v. Social Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). In determining whether a claimant's testimony regarding the severity of symptoms is credible, the ALJ may consider: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

Here, the ALJ's unfavorable credibility finding was based on "the degree of medial treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, and the reports of the treating and examining practitioners." (Tr. 23). These are not clear and convincing reasons for rejecting Hafer's testimony. In fact, the statement of the ALJ amounts to little more than a restatement of the *categories* of evidence that would support an adverse credibility finding, rather than evidence that falls within those categories. Moreover, to the extent the ALJ may have relied on the non-existent DDS reports and her mis-interpretation of the audiology report, the credibility finding is rendered questionable. Without a more complete explanation of the evidence supporting an adverse credibility determination, the Court cannot find that the determination was based on clear and convincing evidence.

### D. Did the ALJ improperly ignore lay witness statements?

Hafer's final argument is that the statements of his son, girlfriend and former girlfriend were improperly ignored. *Motion*, p. 16. The ALJ must take into account testimony of lay witnesses, such as family members, unless the ALJ expressly determines not to "and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Here, the ALJ did not mention or address the submitted statements (Tr. 170-174) and thus did not satisfy the requirements of *Lewis*.

## VI. Recommendation

Based on the foregoing, the Magistrate Judge recommends that the District Court, after its independent review of the record, enter an Order **granting in part** Plaintiff's Motion for Summary Judgment [Doc. No. 12], **denying** Defendant's Cross-Motion for Summary Judgment [Doc. No. 13] and **remanding** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this report and recommendation.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have ten (10) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 06-256-TUC-RCC**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 9th day of January, 2008.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge

18